UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 16-cr-10268-IT |
| | * | |
| SCHULTZ CHAN, a/k/a Jason Chan, | * | |
| and SONGJIANG WANG, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

October 24, 2018

TALWANI, D.J.

A jury convicted Defendants Schultz Chan ("Chan") and Songjiang Wang ("Wang") of one count of conspiring to commit securities fraud in violation of 18 U.S.C. § 371 and two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5. It also convicted Chan on an additional count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5.

At the close of the government's evidence, Wang filed his Motion for Judgment of Acquittal as to Songjiang Wang [#240] under Federal Rule of Criminal Procedure 29(a), which Chan joined through counsel's statement at sidebar. The court reserved decision. See Fed. R. Crim. P. 29(b). Following the jury verdict, Defendants filed their Joint Motion for Judgment of Acquittal and for a New Trial [#266] pursuant to Federal Rules of Criminal Procedure 29(c) and 33. For the following reasons, Defendants' motions are DENIED.

I.     Rule 29 Motion

To succeed on their motions for judgment of acquittal under Federal Rule of Criminal

Procedure 29, Defendants must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018). Where, as here, the court reserves decision on a motion made before submission to the jury, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved," that is, at the close of the government's evidence. See Fed. R. Crim. P. 29(b). In deciding the Rule 29 motion, this court must "resolve all credibility disputes in the verdict's favor." United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (internal quotations omitted). Further, it must "examine the evidence – direct and circumstantial – as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict." United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotations omitted). Viewing the evidence in such a light, the court's role is to determine whether "a rational fact finder could conclude beyond a reasonable doubt that the defendant[s] committed the charged crime[s]." Id.

  a. Background[1]

This case involves Chan's purchases of stock of Merrimack Pharmaceuticals ("Merrimack"), while Wang was employed there, and Chan and Wang's purchases of stock of Akebia Therapeutics ("Akebia"), while Chan was employed there.

Merrimack and Akebia are pharmaceutical companies in the business of developing new drugs. As part of such development, they conduct clinical trials to assess a drug's safety and effectiveness. This process involves three distinct phases. Phase 1 tests drug safety on a small

---

[1] In light of the standard for Rule 29 motions, this background section describes the evidence presented at trial in the light most favorable to the jury's verdict.

group. Phase 2 tests effectiveness and further tests safety on a larger group. Phase 3 tests effectiveness, safety, and side effects on an even larger group. Trial Exhibit ("Ex.") 1.

Chan and Wang's relationship predated their respective employment at Akebia and Merrimack. According to Federal Bureau of Investigation ("FBI") Special Agent Bryan McKay, Chan admitted during a June 2016 interview that he and Wang had regular communications and were part of a close-knit Chinese community.[2] According to FBI Special Agent Ryan Lane, Wang admitted during a June 2016 interview that he communicated with Chan through phone calls and text messages, occasionally met for lunch with Chan during the workday when Chan lived in Massachusetts, and stayed in touch with Chan when he lived in San Antonio, Texas, between 2010 and 2012. Lane testified that Wang stated that he and Chan discussed work, the pharmaceutical industry, and investing, although Wang said that he did not talk with Chan about Merrimack or the drugs that Merrimack was developing.[3] Text and telephone records admitted at trial confirmed Defendants' frequent communications with one another.

i. *Merrimack*

Wang began working at Merrimack as the company's Senior Manager of Statistical

---

[2] When McKay testified, the court instructed the jury that the evidence of what Chan told McKay was only to be considered as to Chan. This was to avoid violating Wang's Sixth Amendment right to confront the witnesses against him, as articulated in <u>Bruton v. United States</u>, 391 U.S. 123 (1968), and <u>Crawford v. Washington</u>, 541 U.S. 36 (2004). <u>See</u> Order [#219]. When Chan later testified, he provided Wang an opportunity for cross-examination, thereby removing these Confrontation Clause issues. Nonetheless, in reviewing Defendants' Rule 29 motion, the court views the evidence as it stood at the close of the government's case. Therefore, the court considers this evidence only against Chan.

[3] The court instructed the jury that Wang's statements to the FBI were only admissible against Wang, for the same reasons articulated *supra* in note 2. Therefore, Wang's statements to Lane are considered only against Wang, and not against Chan.

Programming in December 2011. Ex. 4. His duties included developing statistical programs used to analyze datasets for Merrimack's drug studies. According to Wang's supervisor, Bruce Belanger, Wang was working in 2013 on the biometrics group for the NAPOLI-1 study, a Phase 3 study of the cancer drug MM-398. Belanger Tr. 19:6-17, 57:22-58:11 [#248].

NAPOLI-1's project leader, Peter Laivins, described NAPOLI-1 as a Phase 3 study designed to test whether MM-398 "could prolong survival in patients with metastatic pancreatic cancer." Laivins Tr. 7:24 - 8:2 [#280]. As an "overall survival trial," it was structured to measure how long patients with metastatic pancreatic cancer survived after the start of receiving treatment. Id. at 10:20-24. NAPOLI-1 was comprised of two experimental arms (one MM-398 monotherapy arm and one arm that combined MM-398 therapy with other drugs) and one control arm. Id. at 16:14-16. It was an open-label, randomized trial, meaning that only physicians, and not patients, knew whether a patient was part of one of the experimental arms or the control arm. Id. at 8:11-15. NAPOLI-1 was to be complete when the 305th participant died. Id. at 11:2-4. At that time, Merrimack would stop the study and clean and analyze the data. Id. at 11:8-11.

Merrimack General Counsel Jeffrey Munsie emailed all Merrimack personnel on July 18, 2013, to say that while Merrimack would lift a previously imposed company blackout period prohibiting employees from trading in Merrimack securities for most employees on July 22, certain Merrimack employees remained subject to a blackout based on their "knowledge of material information that has not been disclosed publicly (for instance, clinical trial data, a potential financing or a potential collaboration)." Ex. 10. Seven minutes later, Munsie sent an email to select Merrimack employees, including Wang, stating that they were subject to a continued "material information blackout due to your potential access to or knowledge of

preliminary data from the MM-398 Phase 3 trial. This blackout will last through the second full

trading day after we issue a press release with the top-line data for the trial." Ex. 11.

Laivins testified that he learned on August 28, 2013, that the NAPOLI-1 trial had reached

its full enrollment goal of 405 participants. Laivins Tr. 9:19-25 [#280]. That day, Merrimack

issued a press release announcing this milestone, which stated:

> Currently, there is no approved treatment for patients with
> metastatic pancreatic cancer after gemcitabine has failed, nor is
> there a clear consensus on the standard of care in this patient group.
> Limited data suggest that without effective treatment, these patients
> are expected to live only a few months once they have progressed
> on first line therapy.

Ex. 349. The press release also quoted Merrimack's Vice President and MM-398 Medical

Director Eliel Bayever, who stated: "To our knowledge this is one of the largest controlled

studies ever conducted in this patient population, which has very few treatment options." Id.

On November 7, Munsie sent an email to Merrimack employees stating that the

company-imposed NAPOLI-1 material information blackout "will end as of the end of the day

today. However, please remember that the insider trading laws still apply, so you should not

trade if you have any material non-public information." Ex. 11. When he testified at trial, Munsie

explained that he sent this email because Merrimack "no longer expected to receive [its

NAPOLI-1] data in that fourth quarter of 2013 or even the first quarter of 2014 and that [it] only

expected it to be in the second quarter of 2014." Munsie Tr. 32:1-6 [#281]. Because the end date

of this blackout had been extended far enough, Merrimack lifted the blackout. Id. Munsie further

testified that Merrimack publicly announced on the same date as the email that it now expected

to receive NAPOLI-1 data in the second quarter of 2014. Id. at 32:1-4.

NAPOLI-1's Statistical Analysis Plan, which set forth the protocols for the study,

foreshadowed that, "[i]n the course of data cleaning and statistical programming development, limited Merrimack clinical and biometrics personnel may view data for individual patients that could be unblinding due to the uniqueness of the visit schedules for each arm." Ex. 33 at 11-12. Bruce Belanger, who supervised the NAPOLI-1 biometrics group, explained that Wang's statistical programming work enabled him to view individual patient data, including enough to determine which treatment a patient received. Belanger Tr. 14:23-15:4, 19:15-17 [#248].

Belanger testified as follows. Wang's role in the biometrics group was to supervise statistical programming. Belanger Tr. 7:14 [#248]. As part of this role, Wang developed computer programs to analyze study data. Id. at 7:17-22. In the summer of 2013, the biometrics group had access to preliminary data from MM-398. Id. at 18:10-21, 19:6-17, 57:22-58:11. As Belanger explained, Wang was working on developing the statistical programs for analyzing this data, and this work provided him with access to the live data in November 2013. Id. at 14:8-10, 19:6-11. Before the biometrics group analyzed the data, Belanger testified, Wang was using the preliminary data exported out of NAPOLI-1's electronic data capture system to test the statistical programming software that he was developing. Id. at 16:20-17:2.

The evidence showed that in late November and early December 2013, Chan and Wang engaged in the first of several cash transactions. The government documented a $4,000 cash withdrawal from a checking account in Wang's name on November 21, 2013, Ex. 250, and another $6,000 cash withdrawal from that account on December 2. Id. The government further documented a December 3 cash deposit of $10,000 into Chan's personal checking account, and a subsequent transfer of $10,000 from that account into a newly opened Scottrade brokerage account in Chan's name ("Chan's Scottrade account"). Id. The government further documented a

December 3 order to purchase $9,979.17 of Merrimack stock placed using Chan's Scottrade account. Ex. 255.

The government documented two cash withdrawals totaling $13,000 from Wang's checking account on December 5, 2013, a December 6 cash deposit of $12,000 into Chan's checking account, and a December 6 transfer of $12,000 from Chan's checking account to the Scottrade account. Ex. 250. The government further documented that on December 6, an order to purchase a total of $12,006.10 of Merrimack stock was placed using Chan's Scottrade account. Ex. 255.[4]

During this same period, Chan began to make more frequent and larger purchases of Merrimack shares than he had in the past.[5] Chan and his wife, Linda Wang,[6] placed orders[7] to purchase $53,516.92 of Merrimack stock on November 19; $58,343.06 of Merrimack stock on November 21; and $124,492.47 of Merrimack stock on November 26. Ex. 255.[8]

---

[4] The government also documented two separate withdrawals of $6,000 apiece in cash from Wang's personal checking account on December 12, 2013. Ex. 250.

[5] Chan previously had placed orders to purchase $8,549.99 of Merrimack stock on August 8, 2013, and $7,869.99 of Merrimack stock on August 13, 2013. Ex. 255.

[6] To avoid confusion between Linda Wang and Songjiang Wang, this order always refers to Linda Wang by her full name. References to Songjiang Wang often use only his last name.

[7] The court refers often to the placement of orders to purchase stock. Because the timing of Defendants' conduct is material to their guilt or innocence, it is important to use the time that an order was entered (which is controlled by the investor) rather than the time that an order is executed (which is controlled by the broker). Of course, not all orders placed by investors are executed. Except where it is otherwise noted that an order was either cancelled or expired, the court only refers to "orders to purchase" stock that were ultimately executed.

[8] Chan used accounts at TD Ameritrade to place these trade orders. Ex. 255. Linda Wang used an account at Scottrade (separate from Chan's Scottrade account) to place trade orders. Id. This order notes where Chan used his Scottrade account, but does not distinguish between orders placed using his TD Ameritrade and Vanguard accounts.

Chan and Linda Wang continued to place orders to purchase Merrimack stock through their personal brokerage accounts. Not including Chan's purchases through the Scottrade account, Chan and Linda Wang placed orders to purchase a combined total of $272,966.44 between December 3 and December 11, 2013. Ex. 255.

On February 3, 2014, Chan placed three separate orders to purchase a combined total of $139,820.98 of Merrimack stock. Id.

On February 13 or 14, 2014, Belanger's biometrics group learned that the 305th participant in the NAPOLI-1 trial had died. Belanger Tr. 21:1-5 [#248]. Belanger testified that the occurrence of this event triggered the conclusion of the study and meant that his biometrics team would soon receive the complete dataset for analysis. Id. at 20:21-22.

The government documented a $6,800 transfer from Chan's personal bank account to the Scottrade account that took place on February 24, 2014. Ex. 250. The government further documented a $6,000 cash withdrawal from Wang's personal bank account on February 25 and another $7,000 cash withdrawal from another of Wang's personal bank accounts on February 26. Id. The government further documented a February 27 $19,800 cash deposit into Chan's personal bank account. Id. That same day, a transfer of $13,000 was made from Chan's personal bank account to his Scottrade account took place. Id.

On February 27, 2014, Merrimack held an earnings call with the investing public. Laivins played a speaking role. The PowerPoint slides from the call were admitted as Trial Exhibit 18. This presentation described the three-armed nature of the NAPOLI-1 study. Laivins Tr. 16:13-20 [#280]. Slide Twenty-One described what investors should look for in the NAPOLI-1 trial results. If either one of the NAPOLI-1 experimental arms were successful, Merrimack planned to

file a New Drug Application with the Food and Drug Administration ("FDA"). Id. at 16:13-20. Even if the NAPOLI-1 results did not show that MM-398 led to statistically significant longer lifespans, but nonetheless showed it had possible benefits for patients with pancreatic cancer, Merrimack planned to consider continued development of the drug. Id. at 16:21- 17:1. If NAPOLI-1 showed no meaningful difference between the experimental arms and the control arm, by contrast, this would not bode well for the drug's continued development. Id. at 17:2-5. Under all scenarios, Merrimack announced that it planned to issue a press release regarding top-line data in the second quarter of 2014, followed by a journal publication and potential presentation of the results at a medical conference. Ex. 18 at 21. On February 28, Chan placed an order from the Scottrade account to purchase $19,592.34 of Merrimack stock. Ex. 255.

Belanger testified that he received a primary complete dataset for the NAPOLI-1 trial from the outside vendor that handled operational aspects of the study on March 5, 2014. Belanger Tr. 22:10-12, 23:8-24:3 [#248]. This dataset was disseminated to the biometrics team for analysis. Id. at 24:5-6. Belanger further testified that Wang's role on the biometrics team required him to work with this dataset. Id. at 24:12-17. Further, Belanger testified that those in biometrics could look at the data and draw preliminary conclusions. Id. at 27:4-8.

Between March 6 and March 24, Chan and Linda Wang purchased $515,999.11 of Merrimack stock from accounts other than Chan's Scottrade account. Ex. 255. Chan placed an order to purchase $49,809.99 shares of Merrimack stock on April 4, then placed another order to purchase $52,734.99 shares that same day. Id. On April 10, Chan placed an order to purchase $8,113.95 shares of Merrimack stock. Id.

On April 14, at 3:50 p.m., Chan placed an order to purchase $16,471.49 of Merrimack

stock. Id. At 4:50 p.m. on April 14, Chan called Wang. Ex. 268. At 9:42 a.m. on April 15, Chan

placed an order to sell $145,666.79 of Alexion Pharmaceuticals stock. Ex. 268. Two hours later,

at 11:42 a.m., Wang called Chan. Id. At 3:21 p.m., Chan placed an order to purchase 33,400

Merrimack shares – more than any of his previous Merrimack orders. Id. That order expired. Id.

The next morning, Chan placed an order to purchase 34,610 Merrimack shares. Id. That order

was cancelled. Id. On April 17, Chan entered an order to purchase 32,522 Merrimack shares. Id.

That order expired. Id.

On Saturday, April 19, between 11:30 a.m. and 12:00 p.m., Belanger and Wang received

an email providing them with access to the final dataset from the NAPOLI-1 study. Ex. 50; Ex.

51. After the biometrics team received this email, its members input the data into the statistical

program that Wang had designed. Belanger Tr. 32:1-4 [#248]. According to Belanger, the team

took roughly an hour to complete its final analysis of the NAPOLI-1 data. Id. at 31:23-25.

On Monday, April 21, at 7:54 a.m., Merrimack CEO Robert Mulroy emailed all

Merrimack employees and announced, "[a]s you are aware, we expect to receive data for our

MM-398 trial this quarter. While the results are a great source of excitement internally, they are

also a great source of anticipation externally, especially from the investing community." Ex. 12.

Mulroy further stated that a company-wide blackout was beginning as of April 21. Id. The email

instructed recipients that they should not discuss that they are subject to this blackout, as "[t]he

fact that a blackout is in place is itself material nonpublic information." Id.

On April 21, at 10:30 a.m., Chan placed an order to purchase 32,522 Merrimack shares.

Ex. 268. The order was executed on April 21 for $145,708.55. Id. This was Chan's largest single

executed order to purchase Merrimack stock. On April 25, Linda Wang placed two orders to

purchase a combined total of $22,348.13 of Merrimack shares. Ex. 255.

On April 26 at 1:27 p.m., Belanger emailed Wang a draft version of the Merrimack press release that would announce the positive NAPOLI-1 test results to the public. Ex. 59. Belanger asked Wang to "[p]lease have a look at the attached and let me know if you have any concerns about the presentation of the results." Id. Belanger's email forwarded a longer chain of earlier emails from other individuals, including one from Merrimack's Director of Corporate Communications that stated that the version of the release being passed along was "pretty close to final version at this point," and that "[w]e're still set for this to go out on May 1 at 6 am." Id. At trial, Belanger testified that he asked Wang to review the draft press release because Wang "was very familiar with the data and the results." Belanger Tr. 35:19-21 [#248].

On April 28, Chan and Linda Wang placed orders to purchase a combined total of $67,810.22 of Merrimack stock. Ex. 255. In total, the couple purchased $1,569,713.91 worth of Merrimack stock between November 19, 2013, and April 28, 2014. Id.

On May 1, 2014, Merrimack issued its press release announcing the primary endpoint of overall survival in the NAPOLI-1 trial. Ex. 19. This declared that NAPOLI-1 showed a statistically significant improvement in overall survival time for those in the study's combination experimental arm. Id. The President and Chief Executive Officer of the Pancreatic Cancer Action Network was quoted as saying, "[t]he Pancreatic Cancer Action Network's goal is to double pancreatic cancer survival by 2020. The positive results of this trial demonstrate progress toward that goal in a disease for which additional treatment options are urgently needed to improve patient outcomes." Id. The release ended with an announcement that the study was accepted for presentation at a June 2014 conference, and that Merrimack would submit a New Drug

Application to the FDA for the MM-398 combination regimen in 2014. Id.

Merrimack's share price increased from $4.39 on April 30, 2014 to $6.99 on May 1, 2014 a fifty-nine percent increase. Ex. 275. The volume of Merrimack shares traded increased from 1,047,388 on April 30 to 30,804,948 on May 1. Id.

On May 16, 2014, Merrimack General Counsel Jeffrey Munsie emailed select Merrimack employees believed to have been aware of the NAPOLI-1 trial results prior to April 30, 2014, and informed these employees that Merrimack had received a formal inquiry from the Financial Industry Regulatory Authority ("FINRA") "regarding trading in [Merrimack] securities prior to the announcement of our NAPOLI-1 results on May 1, 2014." Ex. 52. Munsie requested that each of the email recipients send him their full name, Merrimack job title, home address, and the date they became aware of the top-line trial results. Id. Wang responded to the request, writing that he first became aware of the top-line trial results on April 19, 2014. Ex. 54.

Munsie sent another email regarding the FINRA request to select Merrimack employees on August 21, 2014. Ex. 55. This email stated that "FINRA has now advanced their inquiry to the next stage by sending us the attached list of names and asking if any of you recognize any of these names." Id. Included on the attached list was the name "Chan, Schultz," from "San Antonio, TX." Ex. 56. As of September 2, Wang had not yet responded, so Munsie forwarded the August 21 email to Wang again, asking "[w]ould you be able to respond to this today?" Ex. 57. On September 3, Wang responded to Munsie, writing, "I have reviewed the list of individuals in your email attachment and couldn't recognize anyone on the list that I know." Id.

On March 2, 2015, Chan sold $98,219.80 worth of Merrimack stock from his Scottrade account. Ex. 250. On March 24, $98,427.26 was transferred from Chan's Scottrade account to

his personal bank account. Id. The next day, Chan wrote a check from his personal bank account to "Songjiang Wang" for $84,143.38. Ex. 355. The subject line of the check stated that it was for "repayment." Id. This was deposited in Wang's bank account the next day. Id.; Ex. 250.

ii. *Akebia*

On July 28, 2015, Chan accepted an offer to serve as Akebia's Director of Biostatistics. Ex. 72. At the time, Akebia was conducting a Phase 2 study, referred to within Akebia as the "0011 study," of a drug known as "AKB-6548" or "vadadustat." The 0011 study participants were dialysis patients. A prior Phase 2 trial of vadadustat involving non-dialysis patients, known as the "007 study," was already complete when Chan accepted Akebia's job offer.

Akebia filed its Form 10-Q Quarterly Report with the United States Securities and Exchange Commission ("SEC") on August 11, after Chan accepted Akebia's job offer but before he started working there. Ex. 123. The 10-Q Quarterly Report acknowledged that "[t]here was a higher incidence of serious adverse events (SAEs) reported in the [vadadustat] treatment group," during the prior Phase 2 trial (007 study) of vadadustat involving non-dialysis patients. Id. at 46. The Quarterly Report also noted that the results of the ongoing Phase 2 trial (0011 study) of dialysis patients "are expected in the third quarter of 2015." Id. at 19. If those results were positive, Akebia planned "to initiate [its] Phase 3 program of [vadadustat] in dialysis-dependent patients in 2016." Id.

Investors showed interest in what the results from the 0011 study would reveal about vadadustat's safety. An August 12, 2015, report from JMP Securities noted the following: "We anticipate that [Akebia] will release data from an open-label, Phase II trial of vadadustat for treating anemia in end-stage renal disease . . . by the end of [the third quarter of 2015]. In our

opinion, Phase II data have the potential to alleviate safety concerns regarding vadadustat and, therefore, represent a significant upcoming catalyst for the company." Ex. 126. An August 13 report from Morgan Stanley stated the following: "Concerns about an imbalance in the serious adverse events seen in a prior trial caused [Akebia] to drop over 30% when it was disclosed. Subsequent detailed analysis of the data suggests a bias in the way renal adverse events were recorded. Nonetheless, the dialysis trial is important to help restore confidence in the safety of the drug." Ex. 127. Other investment advisors provided similar summaries regarding the upcoming safety results from the 0011 study. See Ex. 128 (Needham Company Report on Akebia); Ex. 129 (UBS Equities Takeaways from Call with Akebia Management).

August 17 was Chan's first day on the job at Akebia. Ex. 132.[9] According to Chan's supervisor, Charlotte Hartman, Chan's first tasks were related to the close-out of the 0011 study. Charlotte Hartman organized a meeting with Chan and two others on the biostatistics team, Head of Safety Philippe Carriere and Director of Clinical Development Karen Annis, "to get together to discuss the plan for topline for CI-0011." Ex. 74. This meeting was scheduled for August 19, 2015, at 11 a.m. Id. Hartman sent the others an invitation to the meeting, which stated that there would be a tight turnaround between the team receiving the top-line 0011 data and needing to present that data to Akebia's executive leadership team. Id.

---

[9] Three days earlier, on August 14, Akebia had sent an email to all of its employees stating that the company was "instituting a restriction on trading in Akebia securities for all employees and directors commencing immediately. This blackout is in connection with the upcoming database lock for Akebia's Phase 2 clinical study of AKB-6548 in dialysis patients." Ex. 63. This email further stated: "Please note that the fact that you received this email, and the information contained herein, is confidential and should not be shared with anyone outside of the company." Id. Although there was some testimony that this email would have been in Chan's inbox when he started work, there was no evidence presented that Chan opened or viewed this email.

On August 19 at 9:48 a.m., Chan emailed Hartman, Carriere, and one other individual to state that he planned to work from home that night, using his personal computer. Ex. 144. At 3:21 p.m., Annis emailed Chan and several others with a message that she expected to receive top-line data for the 0011 study that Friday, August 21. Ex. 81. At 2:11 p.m. on August 19, Chan made an outgoing phone call to Wang, who answered the call. Ex. 259. At 8:03 p.m. on August 19, Carriere emailed Hartman and Chan with a draft of the safety slides for the 0011 study. Ex. 77. In the body of his email, Carriere wrote: "There is really nothing much in the safety data to present or discuss (0 deaths; 0 stroke; 0 DVTs; only 1 MI)." Id.[10] At 9:47 p.m. on August 19, Chan placed an order to purchase $38,647.00 of Akebia stock. Ex. 251. The next morning, at 7:59 a.m., Chan sent an email to Annis requesting more data. Ex. 107. On August 21 at 6:27 a.m., Chan placed an order to purchase $49,456.00 of Akebia stock. Ex. 251.

Between August 19 and August 24, Chan assisted the rest of his team in preparing the top-line data from the 0011 study for presentation to the executive leadership team and then to the public. Ex. 103; Ex. 105. On August 24, Chan emailed Carriere and Hartman the 0011 study numbers. Ex. 103. According to Carriere, the numbers Chan provided in the attachments to this email were the numbers Akebia ultimately used in its press release for 0011.

Phone records for Linda Wang and Schultz Chan show that the couple exchanged at least one phone call per day between August 16 and August 25. Ex. 259. Although a call from Chan to Linda Wang went unanswered on August 26, they also spoke on the phone at least one time per day between August 27 and August 30. Id. Linda Wang placed four separate orders to purchase

---

[10] As numerous witnesses testified, "DVT" refers to deep-vein thrombosis and "MI" refers to myocardial infractions, otherwise known as heart attacks.

a total of $120,420.85 of Akebia stock on the morning of August 24, 2015. Ex. 251. On August 26, Linda Wang placed an order to purchase $30,732.00 of Akebia stock. Ex. 251.

Phone records also show that Chan and Songjiang Wang were in communication during this period. On August 24 at 12:07 p.m., Chan made an outgoing phone call to Songjiang Wang that went unanswered. Ex. 251. Chan called again at 12:28 p.m. Id. This time, Wang answered. Id. Wang called Chan at 2:36 p.m., and Chan answered. Id. Chan and Wang exchanged numerous text messages over the next several days. Ex. 261.

On August 28, Wang placed an order to purchase $21,007.95 of Akebia shares. Ex. 261. That same day, Wang sold twenty Akebia put options for $2,176.15 and purchased twenty Akebia call options for $3,023.80. Id. On August 31, Wang placed orders over the course of the day to purchase a total of $87,783.57 of Akebia stock. Id. On September 1, Wang placed an order to purchase $36,407.95 of Akebia stock. Id. On September 3, Chan called Wang. Ex. 261. The next day, Wang placed orders to purchase a total of $19,940.87 of Akebia stock. Id.

On September 8, 2015, Akebia issued a press release titled "Akebia Announces Positive Top-Line Results from its Phase 2 Study of Vadadustat in Dialysis Patients with Anemia Related to Chronic Kidney Disease." Ex. 121. This press release stated: "Vadadustat demonstrated a favorable safety profile with no drug-related serious adverse events and no deaths. The results highlight the potential of vadadustat, dosed either once daily or three times per week, to safely and predictably manage and sustain [hemoglobin] levels in [chronic kidney disease] patients undergoing dialysis." Id. Further, the press release informed the public that "[t]here were no drug-related [serious adverse events] and no deaths reported in the study." Id.

Akebia's closing price rose from $7.81 on September 8, 2015 to $11.36 on September 9,

2015 an increase of forty-five percent. Ex. 274; Ex. 264. The volume of Akebia shares traded increased from 904,793 on September 8 to 14,770,010 on September 9. Ex. 274.

On November 6, 2015, at 9:59 a.m., a senior legal specialist at Akebia emailed select Akebia employees with a message from Akebia General Counsel Nicole Hadas. Ex. 124. Hadas's message informed employees that FINRA was "performing a routine review of the events leading up to Akebia['s] . . . announcement on September 8, 2015 regarding its positive top-line Phase 2 study results of vadadustat . . . ." Id. Hadas further wrote: "You have been identified as an individual who had access to Akebia's Phase 2 clinical data prior to Akebia's announcement of the results." Id. Recipients of the message were asked to review a list of individuals and entities attached to the message, and to complete a response form indicating whether or not the recipient knew of any of the individuals or entities listed. Id. If the recipient knew any of the names on the list, they were to answer further questions regarding the nature of their relationship with those individuals or entities. Id. On the attached list were the names "Wang, Songjiang or Yang, Yanqing," next to the location "Westford, MA." Id.

Chan replied to the message on November 6 at 10:36 a.m. Ex. 125. His email stated: "Here is the filled out form." Id. Chan answered "NONE" under the statement "[i]f you do not know any of the individuals or entities on the list provided, please check the box below and go to Question 6." Id. Question 6 simply provided instructions for emailing the form. Id. At 10:58 a.m., roughly twenty minutes after sending his reply to the FINRA inquiry, Chan sent a text message to Wang that said "Will you be in office today?" Ex. 269. Roughly fifty minutes later, Wang responded, "No, work from home today. Find some time next week." Id.

FBI agents interviewed Chan and Wang separately in 2016. According to Special Agent

Bryan McKay, agents asked Chan whether he knew Songjiang Wang. Chan first replied that he did not. After agents showed Chan a photograph of Wang, Chan stated he knew the depicted individual by the name "Sam Wang." Chan said that he and Wang engaged in infrequent communications. Chan then corrected this statement to say that he and Wang engaged in regular communications. According to Special Agent Ryan Lane, who interviewed Wang at his home in June 2016, when Wang was asked whether he knew anyone who worked at Akebia, Wang responded "not exactly." Wang then said that "Jason" may work at Akebia. Wang said that he did not know Jason's last name, but that it might be Chan.[11]

      b.   The Charges

The Second Superseding Indictment [#185][12] charged Defendants as follows. Count One charged Chan and Wang with conspiracy to commit securities fraud, "[b]eginning no later than November 2013 and continuing through at least September 2015," in connection with the purchase and sale of Merrimack and Akebia shares. Id. ¶ 26. "A conspiracy conviction under 18 U.S.C. § 371 requires proof that the defendant agreed to commit an unlawful act and voluntarily participated in the conspiracy, and that an overt act was committed in furtherance of the conspiracy." United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013).

Counts Two and Three charged both Chan and Wang with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5, based on a "tipping" theory of

---

[11] As set forth *supra*, the court considers Chan's statements as to Chan only and Wang's statements as to Wang only.

[12] The Second Superseding Indictment [#185] is the operative indictment, and the only indictment referenced in this order. Occasionally, for ease of reading, this order refers to the Second Superseding Indictment simply as "the indictment."

insider trading. This theory subjects a defendant to liability when a corporate insider (tipper) obtains material, nonpublic information from his employer that he knows he is supposed to keep confidential, then provides this information to another individual (tippee), who subsequently "trades in the securities of the tipper's corporation on the basis of [the] material, nonpublic information." Salman v. United States, 137 S. Ct. 420, 425 n.2 (2016) (quoting United States v. O'Hagan, 521 U.S. 642, 651-52 (1997)). Additionally, it must be shown that the tipper intentionally breached his or her duties to the corporation and received or expected to receive some kind of benefit in exchange for providing the information. Id. at 425 n.2 & 427.

Specifically, Count Two charged both Defendants with securities fraud, "in or about April 2014," in connection with Chan's purchases of Merrimack stock, "specifically by willfully engaging in a scheme to trade in Merrimack securities while in possession of material, nonpublic information Wang obtained from Merrimack and provided to Chan." Indictment ¶ 29. Count Three charged both Defendants with securities fraud, "in or about and between August 2015 and September 2015," in connection with Wang's purchases of Akebia stock, "specifically, by willfully engaging in a scheme to trade in Akebia securities while in possession of material, nonpublic information Chan obtained from Akebia and provided to Wang." Id. ¶ 31.

Finally, Count Four charged Chan alone with securities fraud "in or about August 2015 . . . specifically, by willfully engaging in a scheme to trade in Akebia securities while in possession of material, nonpublic information Chan obtained from Akebia," all in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5. Indictment ¶ 33.

    c.   Discussion

Defendants' arguments in support of their motion for judgment of acquittal can be

divided into two main categories. First, they argue that a prejudicial variance occurred between the conspiracy alleged and the conspiracy proven at trial. Second, they contend that there was insufficient evidence to support the verdict. Defendants also advance several other arguments within these main categories.

i. *Prejudicial Variance Claim*

In deciding whether a defendant is entitled to a judgment of acquittal based on a prejudicial variance, the first question is "whether a variance occurred." United States v. Rivera-Donate, 682 F.3d 120, 128 (1st Cir. 2012) (quoting United States v. Pérez–Ruiz, 353 F.3d 1, 7 (1st Cir. 2003)). "A variance occurs when the facts proved at trial differ from those alleged in the indictment." United States v. Cruz-Arroyo, 461 F.3d 69, 77 (1st Cir. 2006) (internal quotations omitted). Even if a variance occurs, it is not grounds for acquittal unless "that variance prejudiced [Defendants'] substantial rights." Rivera-Donate, 682 F.3d at 128 (internal quotations omitted). "[S]o long as the statutory violation remains the same [as that alleged in the indictment], the jury can convict even if the facts are somewhat different than charged – so long as the difference does not cause unfair prejudice." United States v. Wihbey, 75 F.3d 761, 773 (1st Cir. 1996) (internal quotations omitted). "There is no prejudicial variance so long as an indictment provides the defendant[s] with sufficient detail to allow [them] to prepare a defense, avoid unfair surprise at trial, and plead double jeopardy when appropriate." Cruz-Arroyo, 461 F.3d at 77. Defendants advance two variance theories. The first is based on which Merrimack studies were part of the conspiracy and whether this affected the start date of the conspiracy. The

second is based on whether there were multiple conspiracies rather than a single one.

### 1. *Which Studies Were Part of Conspiracy*

As to the first theory, Defendants claim that while the indictment alleged Wang possessed material, nonpublic information about three different Merrimack drug studies, the evidence at trial pertained only to the latest of these studies, NAPOLI-1. Further, Defendants claim that the evidence showed Wang possessed material, nonpublic information no earlier than March 5, 2014. Defendants claim that a variance between the "no later than November 2013" conspiracy start alleged in the indictment and the March 2014 conspiracy start presented to the jury prejudiced Defendants by allowing the government to admit evidence that Wang made a series of cash withdrawals and gave this cash to Chan between November 2013 and February 2014. Defendants describe these transactions as "the most damaging evidence at trial."

It does appear that the government's evidence presented at trial varied somewhat from the indictment. The <u>Second Superseding Indictment</u> [#185] referenced three different Merrimack drug candidates and studies. It alleged that "[o]n or about November 26, 2013, Merrimack announced positive Phase 2 trial results for one of its candidates," <u>id.</u> ¶ 13, that "[o]n or about December 13, 2013, Merrimack announced positive Phase 1 trial results for another one of its drug candidates," <u>id.</u> ¶ 14, and that "[o]n or about May 1, 2014, Merrimack announced positive Phase 3 study results for a third drug candidate." <u>Id.</u> ¶ 15. It further alleged as part of the conspiracy that, "[i]n his position as Director of Statistical Programming, Wang had access to a restricted database that collected clinical trial data, including but not limited to data related to the Merrimack November 26, December 13 and May 1 Announcements." <u>Id.</u> ¶ 16.

These allegations in the indictment refer to three distinct Merrimack studies, although

they omit the names of those studies. At trial, the government's evidence showed that the "November 26 announcement" referred to results from the Phase 2 study of a drug Merrimack was developing known as "MM-121," see Ex. 15, that the "December 13 announcement" referred to clinical data from the Phase 1 study of another drug Merrimack was developing known as "MM-302," see Ex. 350,[13] and that the "May 1 announcement" referred to the primary endpoint of overall survival in the NAPOLI-1 Phase 3 trial of MM-398, see Ex. 19. The government did not introduce any evidence at trial that Wang worked on or had material, nonpublic information from either the MM-121 or the MM-302 studies. Bruce Belanger, Wang's supervisor at Merrimack, also testified that Wang was not part of the MM-121 team.

Because the indictment alleged Wang possessed material, nonpublic information related to all three of these studies, but the evidence at trial showed Wang possessed material, nonpublic information related only to the NAPOLI-1 MM-398 study, the government's evidence varied from the indictment. Contrary to Defendants' assertions, however, this variance did not change the start date of the conspiracy. Defendants argue that the evidence at trial, viewed in the light most favorable to the verdict, was that Wang only obtained material, nonpublic information about MM-398 as of April 19, 2014, and no earlier than March 5, 2014. This is incorrect: Belanger testified that in November 2013, his biometrics group possessed live data from the MM-398 study, that Wang was part of this group and responsible for developing the statistical programs for analyzing the NAPOLI-1 data, and that Wang was working with this data. Belanger Tr. 14:8-10, 19:6-17, 57:22-58:11 [#248]. The evidence at trial thus showed that Wang had

---

[13] Defendants claim "[n]o evidence was introduced at trial regarding a December 13, 2013 announcement." Joint Motion 9 [#266]. However, a December 13, 2013, announcement about Merrimack's Phase 1 study of MM-302, was admitted as Trial Exhibit 350.

access to material, nonpublic information concerning NAPOLI-1 data in November 2013.[14]

Based on Belanger's testimony, a rational jury could find beyond a reasonable doubt that Wang possessed material, nonpublic information about the NAPOLI-1 study in November 2013. November 2013 was also when Wang's structured cash transactions began. Therefore, the government's evidence as to the *time period* of the conspiracy did not vary from the indictment, and did not affect whether evidence of the structured cash transactions would be admitted. Had Defendants sought to exclude evidence of the cash transactions simply on the grounds that they were "uncharged, impermissibly prejudicial and outside the term and scope of the conspiracy," as Defendants contend they would have done, the court would have denied such a motion. These transactions were highly probative and within the scope of the charged conspiracy.

Defendants argue that their defense strategy was premised on the notion that if they defeated the charge that Wang possessed material, nonpublic information pertaining to the MM-121 and MM-302 studies, this would defeat the financial transactions close in time to the November and December 2013 Merrimack public announcements. But Defendants cannot successfully show prejudice merely by showing "they tailored their defense strategy at trial to

---

[14] The government argues that Wang possessed material, nonpublic information as early as July 2013. The government relies on Exhibit 11, a July 18, 2013, email from Merrimack General Counsel Jeffrey Munsie to select Merrimack employees, including Wang, in which Munsie wrote: "As a follow up to my message to the entire company, those of you receiving this email are currently in a material information blackout due to your <u>potential access to or knowledge of preliminary data from the MM-398 Phase 3 trial</u>." This email shows only that Merrimack believed Wang to be at risk of possessing material, nonpublic information. The email appears to have been a preemptive attempt to prevent employees who *might* obtain material, nonpublic information in the future from later violating securities laws when they obtained the information. This email does not prove that Wang actually possessed material, nonpublic information as early as July 18, 2013. <u>See, e.g.</u>, <u>SEC v. Rorech</u>, 720 F. Supp. 2d 367, 410 (S.D.N.Y. 2010) ("Potential 'access' to material nonpublic information, without more, is insufficient to prove that [the defendant] actually possessed any such information.").

their expectation that the government was obligated to prove the entire conspiracy as charged." United States v. Mubayyid, 658 F.3d 35, 54 (1st Cir. 2011). "Where, as here, the indictment alleges a conspiracy to commit multiple offenses, the conviction may be upheld as long as the evidence supports a conspiracy to commit any one of the offenses." United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013). Defendants suggest that the variance from the indictment deprived them of the ability to challenge the admission of the evidence of the structured cash transactions. Because the indictment provided Defendants with adequate warning that the government was alleging a conspiracy starting no later than November 2013, however, it gave Defendants warning that the government could move to admit evidence of the structured cash transactions beginning that month. As described *supra*, the start date alleged in the indictment was consistent with the evidence at trial. Thus, any variance did not prejudice Defendants' ability to prepare to exclude this evidence, and did not prejudice their ability to move to sever or decide whether to testify.

For the foregoing reasons, the variance between the three Merrimack studies described in the indictment's conspiracy charge and the evidence at trial pertaining only to the MM-398 NAPOLI-1 study did not prejudice Defendants. "[I]t is settled that the government need not recite all of its evidence in the indictment, nor is it limited at trial to the overt acts listed in the indictment." United States v. Bradstreet, 135 F.3d 46, 53 (1st Cir. 1998) (internal quotations omitted). So long as the indictment "enables the accused to know the nature and cause of the accusation against him," the government is not required to prove every allegation in the indictment. See United States v. Mueffelman, 470 F.3d 33, 38-39 (1st Cir. 2006) (internal quotations omitted). Defendants cannot show prejudice based on the "narrower conspiracy"

proven here. <u>See</u> <u>Mubayyid</u>, 658 F.3d at 54.

2. <em>Single versus Multiple Conspiracies</em>

Defendants also raise a separate prejudicial variance argument based on the notion that the government's evidence at trial proved multiple conspiracies, rather than the single conspiracy charged in the indictment.[15] The following framework guides the analysis of this question:

> (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so [i.e., the answer to (2) is yes], does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to 'harmless error'?

<u>United States v. Candelaria-Silva</u>, 166 F.3d 19, 39 (1st Cir. 1999) (quoting <u>United States v. Glenn</u>, 828 F.2d 855, 858 (1st Cir. 1987)). This variance claim fails as well.

As described <em>supra</em>, the indictment charged one "conspiracy to commit securities fraud," beginning no later than November 2013 and continuing through at least September 2015, in which Chan and Wang conspired "to use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of . . . shares of Merrimack . . . and Akebia . . . in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission." Indictment ¶ 26. Defendants claim the evidence at trial showed <em>two</em> conspiracies – one involving purchases and sales of Merrimack stock, and the other involving purchases and sales of Akebia stock.[16]

First, the evidence was sufficient to permit the jury to find the single conspiracy charged

---

[15] Defendants developed this argument at the hearing on their Joint Motion.

[16] The court notes that Defendants did not request a multiple conspiracy instruction. Nor did they object to the court's proposed jury instructions, which did not include such a charge.

in the indictment existed. "To determine whether a set of criminal activities constitutes a single conspiracy, [a court] generally look[s] to three factors: (1) the existence of a common goal, (2) overlap among the activities' participants, and (3) interdependence among the participants." United States v. Ciresi, 697 F.3d 19, 26 (1st Cir. 2012).

Here the evidence showed an agreement between Chan and Wang to provide material, nonpublic information, acquired through each Defendant's employment, to one another and to trade in securities of the other's employer based on that information. This satisfies the "common goal" factor, which "is given wide breadth." United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009) (internal quotations omitted). There was overlap among the activities' participants, as *both* Wang and Chan were critical to the provision of information or the purchase of securities in *both* the Merrimack and Akebia purchases. Finally, the "interdependence" factor is about whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Id. at 422 (internal quotations omitted). The evidence showed the Defendants were interdependent upon one another in all aspects of the agreement. Each was directly involved in both main parts of the enterprise and depended on the other's participation. This was not a case of one alleged conspirator being "indifferent to the purposes of others in the enterprise." United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987).

Based on these three factors, the evidence was sufficient to support a finding of a single conspiracy, albeit with multiple crimes. See United States v. Morrow, 39 F.3d 1228, 1233-34 (1st Cir. 1994) ("It is commonplace that a single conspiracy may embrace multiple crimes."). In large part, the Merrimack and Akebia schemes were similar – the employee of the pharmaceutical company developing a drug provided information about that drug and upcoming

announcements about that drug to the other individual. "This pattern and practice bespeaks a single, continuing operation." United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004).

Even assuming, however, that the evidence was insufficient to support a single conspiracy conviction, and that two conspiracies existed instead, the evidence was nonetheless sufficient to permit the jury to find that the Defendants joined *both* the Merrimack-based and the Akebia-based conspiracies. This is what the jury found in convicting both Defendants on the Merrimack-based securities fraud in Count Two and the Akebia-based securities fraud in Count Three. As discussed *infra*, the evidence was sufficient to support each of these convictions. "In the context of alleged multiple conspiracies, the defendant's main concern is that jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme." United States v. Brandon, 17 F.3d 409, 450 (1st Cir. 1994). Defendants rely primarily on United States v. Dellosantos, 649 F.3d 109 (1st Cir. 2011), to support their multiple-conspiracy prejudice argument. But there, "[u]nder the guise of its single conspiracy theory, the government subjected the Defendants to voluminous testimony relating to unconnected crimes in which they took no part." Id. at 125. This "evidentiary spillover" is not an issue where, as here, "ample evidence was presented against each individual defendant based on each defendant's actions and statements." Brandon, 17 F.3d at 451. Accordingly, to the extent the evidence at trial showed two conspiracies rather than the single one charged, that variance was harmless.

Next, Defendants now contend they suffered prejudice because the evidence of the structured cash transactions would not have been admissible in a trial involving only the Akebia-based securities fraud. They contend that they would have moved to sever the Merrimack-based

counts from the Akebia-based counts had they known the government's evidence at trial would amount to two separate conspiracies rather than a single overarching conspiracy.

As an initial matter, the argument fails because the evidence was sufficient to support a finding that these transactions were part of a single conspiracy. Even assuming these consisted of two conspiracies, the court would not have severed those trials, because proof of the structured cash transactions would be admissible even in a trial involving only the Akebia-based securities fraud. At the very least, those cash transactions were relevant as to the nature of Defendants' personal and financial relationship, which is probative for the Akebia trades as well as the Merrimack ones. See, e.g., United States v. Larrabee, 240 F.3d 18, 21-22 (1st Cir. 2001). Thus, Defendants nonetheless would have "failed to make the strong showing of prejudice required to justify severance." United States v. Richardson, 515 F.3d 74, 81 (1st Cir. 2008).

In any event, the severance argument is waived. See Fed. R. Crim. P. 12(b)(3)(D) (requiring any motion for severance of charges or defendants to be made prior to trial); see also United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir. 1992) ("Having failed to move for severance prior to trial, [defendant] waived the right to pursue the issue."). Defendants' argument that the evidence relevant to the "Merrimack counts" prejudiced the "Akebia counts" was available to Defendants prior to trial, and had the indictment been drafted as Defendants contend it should have been, with the conspiracy starting in the spring of 2014, this would not have changed the calculus as to whether multiple separate conspiracies existed.

For these reasons, the evidence at trial was sufficient to support a conviction on the single conspiracy charged in Count One. Even if it were only sufficient to show two separate conspiracies, however, Defendants have not shown they suffered prejudice from such a variance.

Accordingly, Defendants' multiple-conspiracy-based claim of a prejudicial variance fails.

### d. *Other Challenges to Sufficiency of the Evidence*

Defendants also challenge the sufficiency of the evidence on Counts Two, Three, and Four.[17] As to Count Two, Defendants contend there was insufficient evidence to prove Wang possessed material, nonpublic information prior to Chan making the trades at issue. As to Count Three, Defendants concede that Chan possessed material, nonpublic information prior to Wang making the trades at issue, but contend the government failed to prove Chan provided that information to Wang. As to Count Four, Chan contends there was insufficient evidence to prove he possessed material, nonpublic information prior to making the trades at issue.[18]

"In assessing the sufficiency of the evidence under Rule 29, [a court] 'view[s] the evidence and draw[s] reasonable inferences in the light most favorable to the verdict.'" United States v. Diaz, 300 F.3d 66, 77 (1st Cir. 2002) (citation omitted). "The evidence is legally sufficient if, taken as a whole, it warrants a judgment of conviction." Id. (citation omitted). "So long as the guilty verdict finds support in a plausible rendition of the record, it must be allowed

---

[17] Defendants' challenges to the sufficiency of the evidence on Count One are addressed in the previous section's discussion on the conspiracy charge. See Dellosantos, 649 F.3d at 116 (noting variance claim based on multiple conspiracies includes challenge to sufficiency of evidence).

[18] One other argument Defendants raised on all counts is that the evidence at most shows Defendants violated their employers' corporate policies on insider trading, and such evidence does not constitute a violation of insider trading laws. Defendants are right on the law. The court so instructed the jury both during the course of trial when corporate policies were presented or discussed and in its final instructions to the jury. Defendants are wrong on the facts, however. As discussed *infra*, the evidence at trial was sufficient to show violations of the insider trading laws.

to stand." <u>Mubayyid</u>, 658 F.3d at 47 (1st Cir. 2011) (internal quotations and citation omitted).

i.  *Sufficiency of the Evidence on Count Three*

The court will first address Defendants' arguments as to Count Three, where it is undisputed that Chan possessed material, nonpublic information about Akebia's 0011 study of vadadustat prior to Wang's purchases of Akebia stock. Chan admits that he possessed such information as of August 21, 2015, after 3:10 p.m., when he says he received access to the 0011 study results by email.[19] Wang's first purchase of Akebia stock occurred one week later, on August 28, 2015. Defendants argue this span of time creates a reasonable doubt about whether Chan ever provided the material, nonpublic information he possessed to Wang.

Defendants rely on <u>United States v. Larrabee</u>, 240 F.3d 18 (1st Cir. 2001). In <u>Larrabee</u>, a defendant sought to overturn his conviction under a misappropriation theory of insider trading,[20] based on the argument that the evidence at trial was insufficient to show he ever acquired material, nonpublic information. <u>Id.</u> at 20. The defendant argued that the government proved

---

[19] As discussed *infra*, the government disputes that this is the earliest date that Chan possessed material, nonpublic information about vadadustat. For purposes of Count Three, whether Chan obtained material, nonpublic information on August 21 or earlier is not material.

[20] In contrast to <u>Larrabee</u>, the government's case against Chan and Wang was premised on the "classical theory" of insider trading liability. The First Circuit has explained the difference between the "classical" and "misappropriation" theories as follows:

> The classical theory generally only imposes liability when a trader or tipper is an insider of the traded-in corporation. The classical insider-trader thus breaches a fiduciary duty owed to the corporation's shareholders. The misappropriation theory, however, creates liability when a tipper or trader misappropriates confidential information from his source of the information. The misappropriator thus breaches a fiduciary duty owed to the source.

<u>SEC v. Rocklage</u>, 470 F.3d 1, 5 (1st Cir. 2006).

only that he had the *opportunity* to access such information, and failed to show that he actually

possessed it. If there was insufficient evidence to show he ever "appropriated" information, the

defendant argued, then he could not be convicted of "misappropriating" such information based

on a theory that he "tipped" such information to another individual, who then traded on that

information. Id. Ultimately, the First Circuit disagreed that the evidence was insufficient to show

the defendant acquired the information at issue and upheld the conviction. Id. at 24.

    Larrabee set forth factors that are instructive in determining whether the government

proved a *tipper* possessed material, nonpublic information through circumstantial evidence

centered in large part on the *tippee*'s trading activity and other conduct. These factors include:

"(1) [the tipper's] access to information; (2) relationship between the tipper and the tippee; (3)

timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the

trades; and (6) attempts to conceal either the trades or the relationship between the tipper and the

tippee." Id. at 21-22. In contrast to the scenario presented in Larrabee, where the "tipper"

disputed that he possessed material, nonpublic information, Chan concedes that he possessed

such information as of August 21. Thus, Larrabee is not directly applicable to Count Three.

However, some of the Larrabee factors still provide useful guidance in determining whether the

government proved beyond a reasonable doubt that Wang, as the tippee, possessed material,

nonpublic information regarding the 0011 study when he made the trades at issue.

    Insofar as the Larrabee factors apply to this case, most weigh in favor of Defendants'

conviction on Count Three. "Access" is not relevant here, as Chan concedes he possessed

material, nonpublic information. The relationship between the tipper and tippee shows that Chan

and Wang shared "a personal, financial, and professional relationship," much like the tipper and

tippee in Larrabee, 240 F.3d at 22. Also, as in Larrabee, the evidence at trial showed that Chan attempted to conceal his relationship with Wang in his answers to the FINRA inquiry.

Timing in this case is not as close as in Larrabee, where one minute after opening an account containing the material, nonpublic information, the tipper called the tippee and immediately thereafter, the tippee placed an order to purchase shares. Id. at 23. Here, as Defendants highlight, a much longer period of time passed between Chan's receipt of access to the top-line 0011 results on August 21, his call with Wang on August 24, and Wang's purchases of Akebia shares beginning on August 28. Once again, however, the government in Larrabee was using the timing of events to prove that the *tipper* possessed material, nonpublic information. There, the close timing between one individual's opportunity to access such information, his communications with a second individual, and the second individual's purchase of stock soon thereafter provided strong circumstantial evidence that the first individual actually possessed material, nonpublic information. That was not in question here. Timing viewed in light of Wang's pattern of purchases supports the verdict on Count Three. Defendants ignore August 24, which is the critical date between August 21 and 28 when Chan and Wang communicated. Just four days after communicating with Chan, Wang started to place numerous large orders to purchase Akebia shares, to sell Akebia put options, and to purchase Akebia call options. He did this over the course of several days, culminating just before Akebia's September 8 press release announcing the positive results from the top-line data of the 0011 study. When an individual makes an uncharacteristically large investment in a stock soon after speaking with someone who possesses material, nonpublic information relating to that stock, this is strong circumstantial evidence that the investment was based on such information. See Larrabee, 240 F.3d at 23.

Based on the foregoing, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Chan and Wang are guilty on Count Three.

ii.  *Sufficiency of the Evidence on Count Four*

As to Count Four, Chan contends that there was insufficient evidence to show he possessed material, nonpublic information before making his August 19, 2015, purchase of $38,647.00 shares of Akebia stock. According to Chan, he only possessed material, nonpublic information as of August 21, 2015, at 3:10 p.m. The evidence at trial, however, was sufficient to support a jury finding beyond a reasonable doubt that Chan possessed material, nonpublic information prior to his August 19 purchase. For one, Carriere's email to Hartman and Chan on August 19 at 8:03 p.m. contained information that the 0011 top-line results would show positive safety data. The evidence also showed Chan was working from home the night that this email was sent. Chan seems to argue that the fact that this email was sent at that time provided him only with the *opportunity* to access the information Carriere provided. While "opportunity alone does not constitute proof of possession, opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of possession . . . ." Larrabee, 240 F.3d at 21. Chan placed an order to purchase $38,647.00 of Akebia shares one hour and forty-three minutes after Carriere sent this email. That is sufficient to allow the jury to conclude Chan viewed the email and then made the trades. Even if Chan did not open his work email that night, however, the evidence at trial showed Chan had opened his work email as of 7:59 a.m. the next day, August 20, when he replied to an earlier email from Annis. Chan then placed an order on August 21 to purchase $49,456.00 of Akebia shares. At the very least, a jury could find beyond a reasonable doubt that

Chan possessed material, nonpublic information when he made this latter purchase of Akebia stock. This is sufficient to support the jury's guilty verdict on Count Four.

iii. <em>Sufficiency of the Evidence on Count Two</em>

As for Count Two, Defendants contend there was no evidence Wang possessed material, nonpublic information about the NAPOLI-1 trial before March 5, 2014, and only minimal evidence that he possessed such information prior to April 2014. Evidence at trial showed that Chan purchased Merrimack shares beginning in early August 2013 and continuing until the May 1, 2014, announcement. As discussed *supra*, the evidence at trial was sufficient for the jury to conclude that Wang possessed material, nonpublic information starting in November 2013, that he continued to acquire further material, nonpublic information up until the days before the May 1 announcement, that he provided this information to Chan from November 2013 through April 2014, and that Chan purchased Merrimack shares based on that information. In particular, the evidence showed that, beginning roughly three hours and forty minutes after speaking with Wang on the phone on April 15, Chan placed his single largest order to purchase Merrimack stock. When that order expired, Chan continued to place these purchase orders until his April 21 order to purchase 32,522 shares was executed at a net cost of $145,708.55. Ex. 268. Soon thereafter, Merrimack issued its press release announcing the positive NAPOLI-1 results. In sum, the evidence was sufficient to support the jury's guilty verdict on Count Two.

II.     Rule 33 Motion

Defendants also move for a new trial pursuant to Federal Rule of Criminal Procedure 33, which permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." In considering the Rule 33 motion, the district court may "weigh the evidence and

evaluate the credibility of witnesses, but the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." <u>United States v. Merlino</u>, 592 F.3d 22, 32 (1st Cir. 2010) (quotations omitted). "[I]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." <u>Id.</u> (quotations omitted).

Defendants' briefing differentiates between their Rule 29 and Rule 33 arguments in the conclusion only. There, Defendants urge the court "to enter a judgment of acquittal as to the Merrimack Counts and order a new trial as to the Akebia Counts." Joint Motion 19 [#266]. Defendants appear to argue that if the court were to agree that a judgment of acquittal is warranted on the counts involving Merrimack trades, then it could conclude that allowing the jury to hear the government's evidence on these counts may have prejudiced the jury's analysis of the counts involving Akebia trades. As set forth in the preceding sections, however, there is no basis for entering a judgment of acquittal on any of the counts charged. Accordingly, this argument for a new trial fails.

Defendants' Rule 33 motion presents an opportunity to address another argument Chan has raised throughout this prosecution. This argument, as reflected in Chan's trial testimony, is that Chan was able to obtain sufficient information through publicly available sources, combined with his own knowledge and expertise in the biotech industry, to determine that the NAPOLI-1 and the 0011 studies were going to show positive results for their respective drugs and companies even before Merrimack and Akebia issued the relevant press releases.

Chan's testimony in support of this argument was as follows. Chan has a doctorate and other advanced degrees, and has had a successful career in the biotech industry, where he has

worked since 1996. More than fifteen years ago, he became interested in trading in the stock market. Over the course of those fifteen years, he has invested almost exclusively in biotech stocks, because this is the industry he knows. When he wakes up in the morning, Chan peruses bioscience-related websites for news relating to pharmaceutical companies. Chan's process for deciding which companies to invest in is to (1) understand the science behind the drug in development; (2) review clinical data about that drug and information about any studies planned for the future through publicly available sources including the FDA and SEC websites as well as the pharmaceutical company's website; (3) track the history of the pharmaceutical company's stock; and (4) compare the drug in question to "benchmark" drugs with similar characteristics. Chan testified that he used this process to obtain and analyze the information that led him to make each of his purchases of Merrimack and Akebia shares at issue in this prosecution.

With respect to Merrimack, Chan testified that he began researching the company shortly after he learned Wang was working there. In the course of his research, he learned about MM-398. Chan had a high opinion of MM-398 because he had invested in a similar targeted chemotherapy drug in the past that had earned him a substantial return. Chan consulted with some of his other friends in the pharmaceutical industry, who did not work at Merrimack, to test his positive view of MM-398. Based on a July 2013 publication about the drug in the British Journal of Cancer, Chan knew that the life expectancy for the patient population in the NAPOLI-1 study was roughly three months, but that patients receiving MM-398 showed a median survival time of more than five months. When Merrimack announced on November 7, 2013, that the expected release date for top-line data from the NAPOLI-1 trial of MM-398 was moved from the fourth quarter of 2013 or first quarter of 2014 to the second quarter of 2014, Chan suspected that

patients were living longer than expected, and surmised this was because of MM-398.

As for Akebia, Chan testified that he reviewed the safety data from the 0007 study of vadadustat in 2014 and concluded that safety concerns about the drug were inflated due to a reporting bias. Chan decided to begin purchasing Akebia shortly after he accepted a job there in late July 2015, and as soon as he could find a good time to buy. His confidence in vadadustat was bolstered by Akebia's 10-Q filing in early August 2015, which revealed that the company was planning a Phase 3 study of vadadustat for 2016. Chan also understood that his own hiring was a sign that Akebia was planning for a Phase 3 study and for vadadustat's success.

All of this testimony from Chan as to how he decided to purchase the Merrimack and Akebia shares at issue was dependent upon the jury finding Chan to be credible. The jury's apparent finding that Chan was not credible was a reasonable one in light of the significant gaps and inconsistencies in Chan's testimony. Defendants have not shown any exceptional circumstances warranting court intrusion "upon the jury function of credibility assessment." Merlino, 592 F.3d at 32 (internal quotations omitted).

Even assuming, however, that Chan had been a credible witness as to his own independent appraisal of these drugs, the question is not whether Chan had the skills to make predictions about the drugs that turned out to be right. Rather, the question is whether the government has proven that Chan had material information that the market did not know at the time Chan made the trades at issue. Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (internal quotations omitted).

Even if Chan combined his expertise in the field with publicly available information to arrive at predictions about the likely success of MM-398 and vadadustat, the government's evidence nonetheless supports a finding that Chan traded while in possession of material, nonpublic information. With respect to Akebia, Chan traded *after* he received the email from Carriere confirming that this prediction was accurate, and when he knew from his preparation of the top-line data for presentation that the public would soon learn these positive safety results. With respect to Merrimack, Chan purchased a large number of Merrimack shares soon after Wang's biometrics team received data confirming the statistical significance of the increased lifespan for those in the study's combination experimental arm, and after Wang learned when this would be announced to the public. This information confirming Chan's predictions and notifying him of when these positive results would be announced to the public was material, as evidenced by the increase in share price and trading volume that followed both relevant press releases. Even taking Chan at his word, his defense does not hold water.

Defendants have not provided any other explanation for why they may be entitled to a new trial even if they are not entitled to a judgment of acquittal. In any event, the court has reviewed the evidence in the case and concludes that Defendants have not demonstrated any miscarriage of justice, or that the evidence preponderates heavily against the verdict.

III.    Conclusion

For the foregoing reasons, Defendants' Joint Motion for Judgment of Acquittal and for a New Trial [#266] and Motion for Judgment of Acquittal [#240] are DENIED.

IT IS SO ORDERED.

October 24, 2018                          /s/ Indira Talwani
                                          United States District Judge