UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____
                                           )
UNITED STATES OF AMERICA,    )
                                           )
v.                                          )        DOCKET NO.: 16-10268IT
                                           )
SSHULTZ CHAN,                 )
         Defendant.       )
_____)

## DEFENDANT CHAN'S SENTENCING MEMORANDUM AND INCORPORATED MOTION TO STRIKE PORTIONS OF THE PSR

NOW COMES the Defendant, Schultz Chan, through counsel, and hereby moves this Honorable Court for a downward departure and/or variance pursuant to 18 U.S.C. 3553 from the otherwise applicable guideline range both as recommended by the Probation Department in the Presentence Report, ("PSR"), and/or from the Defendant's final Guideline Sentence as determined by the Court . The Defendant also submits the instant Memorandum in support of the factual challenges and the legal issues raised in his suggested revisions to the PSR which were not adopted by the Probation Department as of the date of the filing of this Memorandum. In support thereof, counsel states the following:

## I.     ARGUMENT SUMMARY

The use of unrealized gain in the PSR creates an exaggerated and factually dishonest gain that adds years to the Defendant's sentence for a crime that was not proven.  The unrealized gain calculation punishes the Defendant as if he sold stock at the highest value despite the fact that he held on to it.  This defies logic, fundamental fairness and the Defendant's Process Rights.  The reason the Government has embraced this calculation is because when accurately calculated based upon disposed and currently held stock which is traceable to the offense, it is clear that the Defendant lost money on the convicted criminal activity.  Therefore, there is no gain, which is very upsetting to the Government.1

Assuming arguendo that this Honorable Court accepts the unrealized gain calculation or some portion thereof, it is respectfully urged to depart from the Sentencing Guidelines and/or find sufficient variances from the factors set forth in 18 U.S.C. § 3553 based upon this absurd result which was clearly not contemplated by the Guidelines.

## I.     ARGUMENT2

---

1 To be clear, it is not the Government's fault or Chan's that after the Superseding Indictment in this case, Merrimack created a reverse 10/1 stock split which resulted in the depreciation of the stock subject to this indictment.
2 The Defendant hereby incorporates by reference those arguments and calculations set forth in his initial objections to the draft PSR submitted to the U.S. Probation Department which are appended to the final PSR.

The First Circuit has described the Guidelines method for calculating loss as crude standard. *United States v. Cacho-Bonilla*, 404 F.3d 84, 92 (1st Cir. 2005); *United States v. Parsons*, 141 F.3d 386, 392 (1st Cir. 1998). There is no better example of this "crudeness" than its application in the instant case.

Chan respectfully submits that any adjustment to the base offense level of 8 should more accurately be based upon the value of any shares when they were sold or their present value and Chan's proportionate share of any criminal activity. Instead, the PSR seeks to impose a Guideline sentence based upon a benefit Chan never received and shares acquired by others whom Chan had no control over.

## A.  THE GUIDELINES DEFINE "GAIN" AS "THE TOTAL INCREASE IN VALUE *REALIZED* THROUGH TRADING IN SECURITIES BY THE DEFENDANT".

The PSR incorrectly calculates Chan's gain as the amount of "unrealized gain" he could have obtained had he immediately sold the stock at its highest value. This calculation is the white collar equivalent of punishing someone who robbed a bank teller by using the total value of assets at the bank that were not taken to calculate loss.

In *United States v. Mooney*, 425 F.3d 1093, 1100 (8th Cir. 2005), the United States Court of Appeals for the Eighth Circuit applied the plain mean of "gain" as defined by the Sentencing Guidelines to mean the gain as "the total increase in value *realized* through

trading in securities by the defendant". The Court drew support for the plain meaning of this definition from the commentary to U.S.S.G. 2.14:

> This guideline applies to certain violations of Rule 10b–5 that are commonly referred to as "insider trading." Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, *the gain, i.e., the total increase in value realized through trading in securities by the defendant* and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses.

*Id., but see United States v. Nacchio*, 573 F.3d 1062, 1086 (10th Cir. 2009)(important objectives of federal sentencing-specifically, sentences should reflect the individual criminal culpability of defendants and avoid unwarranted sentencing disparities are diminished if sentences are to be based upon the volatility of the stock market). In *Nocchio*, the Court focused instead on what has been referred to as the market absorption approach in defining "gain." This approach would require defendants who committed the same crime, but made varying profits to be sentenced the same based upon an arbitrary value determined by the sentencing court and not the true gain realized by the defendant. *Id.* The absurdity of this analysis is that defendants who hold stock and thereby subject it to the normal ebbs and flows of the market are deemed equally culpable as the insider who immediately cashes out. Subjecting the ill gotten gains to market fluctuations is a mitigating circumstance because it restores the normal value to the stock.

Additionally, the "unrealized gain" approach ignores the fact that there are two very different subsets of insider trading. The "unrealized gain" analysis addresses the profit seeker subset. This is characterized by a quick buy and sell to reap the intervening profit.

Chan was clearly not a profit seeker. Chan was a bargain shopper. He was looking to buy low on the eave of good corporate news and hold the stock for a long period of time. He was not interested in the short term gain and his impact upon the market was much less than the profit seeker who helped drive the price higher by selling immediately. It is grossly unfair to punish the "profit seeker" in the same manner as the "bargain shopper".

Better still is the irony that the Eighth Circuit was required to render this analysis in response to the Defendant's argument on appeal that the district court had erred in failing to reduce his calculated gain by an "unrealized loss". Clearly, unrealized gains and losses are pure fiction and should not be the basis for additional years of incarceration.

Additionally, the Tenth Circuit failed to address the fact that many assets change value or fluctuate during the period of the offence or the case in general. The commentary 3(F) to 2B1.1 provides that:

> (ii)   In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.
>
> (iii)  Notwithstanding clause (ii), in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of <u>nolo contendere</u>.
>
> In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.

None of the above scenarios require the Court to assess the value of assets to be set at the highest value they ever achieved. In fact, mortgage fraud cases typically deal with assets subject to a turbulent real estate market. These properties may be overvalued based upon the fraud itself or unrealistic market conditions. The commentary clearly seeks to prevent punishment for a falsely inflated value.

    The same logic prevails with respect to the stock market. There was ample evidence from the Government's own witnesses that they believed that "Wall Street" had incorrectly identified a health risk in its Phase 2b study. This error was corrected when

the 21 announcement was made on September 8, 2015. This market correction should not play any role in Chan's sentence.

**B.     THE LOSS CALCULATIONS DO NOT TAKE INTO CONSIDERATION THE TUMULTUOUS HISTORY OF THE MERRIMACK STOCK, IN PARTICULAR, THE STOCK WAS SUBJECT TO A REVERSE 1:10 STOCK SPLIT IN SEPTEMBER, 2017 THAT CAUSED ALL RELEVANT SHARES TO BE REDUCED BY A FACTOR OF 10.**

The PSR assumes that Chan still owns all the Merrimack stock he purchased, which is not true based upon the evidence at trial. At trial, Exhibit 255 was misleading as were any exhibits purporting to describe the value of the Merrimack stock as "unrealized gain." This is particularly true where a reverse 10/1 stock split in September of 2017 permanently reduced the number of shares held by the Defendants and others by a factor of ten. The Merrimack stock continued to crash following the reverse split to the point where the Government's "unrealized gain" at trial looked like a short term gain. In reality and as shown below, the losses from the Merrimack stock are staggering for those that held on to the stock.

|  | **Buy** | **Shares**3 | **Price** | **Sold** | **Price** | **Proffit/Gain** |
|---|---|---|---|---|---|---|
| Scottrade | 12/3/13 | 2330 | 4.28 | 3/2/15 | 10.99 | 15,634 |
|  | 12/6/13 | 2553 | 4.70 | 3/2/15 | 10.99 | 16,058 |
|  | 2/28/14 | 4055 | 4.83 | 3/2/15 | 10.99 | <u>24,978</u> |
|  |  |  |  | **Subtotal:** |  | **$56,670** |

*All accounts      9/1/17      1/10 reverse split=10 shares are now 1 share*

### Count 2-Pre 4/19/14 Purchases

| Chan | 4/21/14 | 3,252 | 44.80(10/1/18) | 5.32 | (128,407) |
|---|---|---|---|---|---|
|  | 4/28/14 | 574 | 42.30(10/1/18) | 5.32 | ( 21,236) |
| Linda Wang | 4/25/14 | 500 | 44.70(10/1/18) | 5.32 | ( 18,843) |
|  | 4/28/14 | 1000 | 43.00(10/1/18) | 5.32 | ( 39,044) |

### Remaining Shares

| Chan (TDx0260) | multiple | 7,000 | 38.23 | 12/21/17 | 10.41 | (194,634) |
|---|---|---|---|---|---|---|
| (Remainder) |  | 17,617 | 44.304 | 10/1/18 | 5.32 | (686,710) |
| Linda Wang | 11/13-3/14 | 5,000 | 44.30 | 10/1/18 | 5.32 | (194,900) |
| Jiang & Li | 8/13-3/14 | 7423 | 38.605 | 10/1/18 | 5.32 | (246,843) |
| Hui Zhang | 12/13-4/14 | 400 | 48.206 | 10/1/18 | 5.32 | ( 17,152) |
|  |  |  |  | **Subtotal:** |  | **($1,547,769)** |
|  |  |  |  | **Total Loss:** |  | **($1,491,099)**7 |

---

3 The number of shares remaining after 2/28/14 has been adjusted to reflect the 2017 1/10 reverse stock split. The purchase price per share has been multiplied by 10 to reflect the value as a result of the stock split.
4 44.30 is the average price per share paid by Chan and Linda Wang x 10, based upon the 1/10 reverse split.
5 38.60 is the average price per share paid by Jiang and Li x 10, based upon the 1/10 reverse split
6 48.20 is the average price per share paid by Zhang x 10 based upon the 1/10 reverse split.
7 This figure represents the value of shares, if the owners retained possession. The Government's calculations do not

**AKEBIA**

Akebia stock is currently valued at $8.61 on October 2, 2018. This is the measure that should be used rather than the $11.36 share price suggested by the Government. In addition, the Government seeks to include the 8/13/15 purchase of stock by Chan in its gain calculations. This defies its own presentation of the case to the jury wherein it agreed that the 8/13/15 purchase was made by Chan prior to his possession of any MNPI. As a result, 2,200 shares should be subtracted from Chan's calculations.

Here are the Defendant's calculations of the Akebia gains:

|  | #Share | 10/2 | 10/2 value | Cost Basis | Gain |
|---|---|---|---|---|---|
| Chan | 13,800 | 8.61 | 118,818 | 88,103 | 30,715 |
| Linda Wang | 23,500 | 8.61 | 202,335 | 151,153 | 51,182 |
| Wang | 27,900 | 8.61 | 240,219 | 197,386 | 42,833 |
| Li | 12,350 | 8.61 | 106,333 | 76,965 | 29,368 |
| Zhang | 7,500 | 8.61 | 64,575 | 51,506 | <u>13,069</u> |
|  |  |  |  | Total: | **$167,167** |

Because the Defendants herein were charged with a conspiracy it logical to consider any gain, whether positive or negative, in the aggregate. Here, Chan's losses as a result of the offenses far outweighed any gain from an individual transaction.

---

reflect actual sales of stock at any time. As a result, it is difficult for the Defendant to make a calculation based upon actual sales other than the 3/2/15 sale and the 12/21/17 sale.

9

## C.    THE INCLUSION OF STOCK PURCHASES BY OTHERS KNOWN TO CHAN IS EXCESSIVE AND IS NOT SUPPORTED BY THE EVIDENCE.

Chan does not agree that he should be held accountable for any gains associated with anyone else as suggested by the PSR.  Absent proof of a specific tip it is unfair to add these amounts to relevant conduct and dramatically increase his Guideline sentence. There was no proof offered at trial as to the nature of any communications between Chan and the other individuals listed above.  There were phone records offered to show that they knew each other and spoke to each other during the time frame of the transaction. However, there were no bank records establishing financial connections in the same manner as the bank transactions that occurred between Chan and Wang in November and December of 2013 and February of 2014.  Indeed, these purchases could simply have been based upon the individuals perception that Chan or Wang is happy about their new company and positive about the future.  Without more, it is impossible to fine that the transactions were related to criminal activity.

More importantly, even if the Court were to find that there was a "tip", Chan had no control over the amount of stock purchased by the individual.  Chan's culpability in making any alleged tip should be the same as if individual lost money or made millions.

With respect to Wang's purchases which were part of the conviction, it is the Defendant's position that all of the evidence at trial established that Wang's intent was to

place a "limit order". This meant that he was only willing to purchase the stock at a certain price. This is not consistent with the receipt of insider information because Wang is betting that the stock will go down in the short term. The same is true for Chan's purchases. More important, with respect to Wang's Merrimack purchases there is no evidence that Wang's purchases were known to Chan or part of any conspiracy. Indeed, this remains uncharged conduct. The success of the alleged conspiracy was not dependent or predicated on Wang's purchases of Merrimack stock. Much like Count 4 which charges Chan by himself with purchasing Akebia stock when he had MNPI, Wang's purchase was a separate crime from the conduct alleged in the conspiracy.

### D. THE PSR INCORRECTLY ASSESSES AN ADJUSTMENT FOR ABUSE OF TRUST

This adjustment is not appropriate given Chan's tenuous relationship with Akebia at the time of the offense. He had just started employment at Akebia. He was not immediately given the keys to Akebia's vault of insider information. Instead, he was given a few slides that had been created a month earlier by another employee with an update that nothing had changed. This information was consistent with other published results from Phase 2 and represented a minor subset of individuals involved in the Phase 2 study. *United States v. Georgiadis*, 933 F.2d 1219, 1225 (3d Cir. 1991)(distinguishing a breach of trust from abuse of trust).

### E. THE OFFENSE OF CONVICTION IS LESS SERIOUS THAN CONTEMPLATED BY THE SENTENCING GUIDELINES

Assuming *arguendo* that the Court decides to follow the gain analysis set forth in PSR, this case again provides the Court with an excellent example of the Guidelines failure to address a very simple fact pattern where a defendant is convicted of financial crime and the is no gain to the Defendant.  The Guidelines simply provide a dollar amount by which all fraud perpetrators are to be sentenced, with very little analysis of the facts or deviation from the sentence.  To equate Chan's conduct with defendant's who have made substantial gains from the immediate sale of stock after a public announcement is not fair.

Accordingly, this Court may consider this apparent discrepancy in deciding whether to depart or construct a variance pursuant to 3553 from the Guideline sentence. The sentencing guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220 (2005).  Federal Courts are now free to tailor individual sentences in light of the factors set forth in 18 U.S.C. 3553 (a), which includes the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; (2) the need for the sentence imposed-(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the Defendant; and (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment ...; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing

> range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines ...; (5) any pertinent policy statement ...; (6) the need to avoid unwarranted sentence disparities among Defendants with similar records ...; and (7) the need to provide restitution to any victims of the offense.

18 U. S. C. 3553 (a)(2)(A)(B)(C)(D).  The Supreme Court's decisions in *United States v. Booker,* 543 U.S. 220 (2005), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Gall v. United States,* 552 U.S. 38 (2007), expand the basis for non-guidelines sentences to include all offender and offense characteristics and to include policy problems in the applicable guidelines, and requires judges to impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing.

In *Gall,* the court set forth a three step procedure:  First, begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  Second, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should consider all of the 3553(a) factors to determine whether they support the sentence requested by a party.   Third, the judge should explain.  *Gall*, 552 U.S. at 50.  The court did not make any mention of the Commission's policy statements regarding departure.

However, the Court stated that in some cases, a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a

means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing. *Id.* at 599. A sentence at the high end of the applicable guideline range is not a just and reasonable sentence, it is harsh and is greater than necessary to achieve the statutory objectives of sentencing.

Moreover, data demonstrates with respect to Akebia that 14% of the U.S. population has CKD which equates to approximately 42,000,000 million patients. (See Exhibit 5 filed with Defendants' Motion to Dismiss, *National Institute of Diabetes & Digestive & Kidney Diseases, niddk.nih.gov (2015)*). Diabetes is an advanced form of CKD for which dialysis is used to treat the most severe form of diabetes. Dialysis is used to treat 468,000 patients annually in the United States.[8] As a result, only 1.114% of the potential CKD patients are on dialysis. Phase 2 an the MNPI related only to this small percentage. The Court should find that the impact of the announcement was negligible and based upon a correction of erroneous Wall Street information.

The facts as set forth in Part B of the PSR are incorporated by reference herein, and will not be repeated herein, except in summary form. The Defendant by all accounts had an impoverished upbringing in China which he distanced himself from by hard work in both academia and the biotech field. To sentence him to a multi- year period of incarceration based upon a singular course of conduct that resulted in little or no harm to any victim is unfair and disproportionate pursuant to 3553. Here, at worst, Chan took

---

8 https://www.kidney.org/news/newsroom/factsheets/End-Stage-Renal-Disease-in-the-US.

advantage of information that was available publicly if one knew where to look and used it to make bargain purchases in both Merrimack and Akebia's stock. With respect to Merrimack, the stock had already absorbed the good news of a successful Phase 2 study. Phase 3 was a victory lap for something the market had already considered. Chan then held on to it allowing the normal market process to settle any short term gain that he might have realized if he sold early. This is not a serious violation of insider trading laws where the information became public in the short term, was not of critical importance and Chan did not capitalize on the short term gain.

### F.    ABERRANT BEHAVIOR

Chan's criminal conviction constitutes aberrant behavior entitling him to a departure from the applicable sentencing guidelines. *United States v. Pozzy*, 902 F.2d 133, 137-138 (1st Cir. 1990); citing *United States v. Russell*, 870 F.2d 18 (1st Cir. 1989). He has no prior record and has worked extremely hard for a length period of his life to attain a position in the pharmaceutical industry that is in high demand. There is no better example of "aberrant behavior" than this case.

### G.    COMBINATION OF FACTORS

A combination of the above factors may constitute a separate basis for departure. *Koon v. United States*, 518 U.S. 81, 113-14 (1996); *United States v. Sklar*, 920 F.2d 107, 117 (1st Cir. 1990).

## H. PORTIONS OF THE PSR ARE NOT RELEVANT AND SHOULD BE STRICKEN.

This Court has authority to strike all or portions of a Presentence Report for reasons including the timeliness of disclosures and the prejudicial content of the Report. *United States v. Rouland,* 1993WL410455, aff'd 9 F. 3d 1555 (9th Cir. 1993); *United States v. Santana-Camacho,* 931 F. 2d 966, 969 (1st Cir. 1999).

## II. CONCLUSION

Based upon the foregoing arguments and authorities this Honorable Court is respectfully urged to impose a sentence consistent with the arguments set forth herein.

Respectfully submitted,

_____
Peter Charles Horstmann, Esquire
BBO #556377
450 Lexington Street, Suite 101
Newton, Massachusetts 02466
(617) 723-1980

## CERTIFICATE OF SERVICE

I, Peter Charles Horstmann, Esquire, hereby certify that on this 2nd day of November, 2018, a copy of the foregoing motion was served electronically, upon Jordi De Llano, Office of the United States Attorney, One Courthouse Way, Boston, MA 02110.

_____
Peter Charles Horstmann, Esquire